## UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF LOUISIANA

RICKEY D. BROWN                                    CIVIL ACTION

VERSUS                                                     NO. 20-2933

DARREL VANNOY, WARDEN                      SECTION: "E"(3)


### REPORT AND RECOMMENDATION

Petitioner, Ricky D. Brown, a Louisiana state prisoner, filed this federal application seeking habeas corpus relief pursuant to 28 U.S.C. § 2254. For the following reasons, it is recommended that the application be **DISMISSED WITH PREJUDICE**.

On February 29, 2012, petitioner was convicted of second degree murder under Louisiana law.[1] On March 21, 2012, he was sentenced to a term of life imprisonment without benefit of parole, probation, or suspension of sentence.[2] On April 30, 2014, the Louisiana First Circuit Court of Appeal affirmed his conviction and sentence.[3] The Louisiana Supreme Court then denied his related writ application on September 18, 2015.[4]

On or about March 17, 2016, petitioner filed an application for post-conviction relief with the state district court.[5] That application was denied on February 25, 2019.[6] His related writ

---

[1] State Rec., Vol. 2 of 4, transcript of February 29, 2012, p. 100; State Rec., Vol. 1 of 4, minute entry dated February 29, 2012; State Rec., Vol. 1 of 4, jury verdict form.

[2] State Rec., Vol. 2 of 4, transcript of March 21, 2012; State Rec., Vol. 1 of 4, minute entry dated March 21, 2012.

[3] State v. Brown, No. 2013 KA 0560, 2014 WL 2711808 (La. App. 1st Cir. Apr. 30, 2014); State Rec., Vol. 1 of 4. The Court of Appeal also subsequently denied petitioner's application for rehearing. State v. Brown, No. 2013 KA 0560 (La. App. 1st Cir. June 11, 2014); State Rec., Vol. 1 of 4.

[4] State ex rel. Brown v. State, 177 So. 3d 1066 (La. 2015); State Rec., Vol. 1 of 4.

[5] State Rec., Vol. 1 of 4.

[6] State Rec., Vol. 1 of 4.

applications were likewise denied by the Louisiana First Circuit Court of Appeal on April 23, 2019,[7] and September 30, 2019,[8] and by the Louisiana Supreme Court on September 23, 2020.[9]

On or about October 20, 2020, petitioner filed the instant federal application seeking habeas corpus relief.[10]  The state filed a response conceding that the application is timely and that petitioner exhausted his remedies in the state courts; however, the state argues that his underlying claims have no merit.[11]  Petitioner filed a reply.[12]

## I.  Standards of Review

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") "modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." Bell v. Cone, 535 U.S. 685, 693 (2002); accord Langley v. Prince, 926 F.3d 145, 155 (5th Cir. 2019) (noting that the AEDPA imposes a "relitigation bar" on claims adjudicated on the merits by the state court), cert. denied, 140 S. Ct. 2676 (2020).  The applicable standards of review are now as follows.

As to pure questions of fact, factual findings are presumed to be correct and a federal court must give deference to the state court's decision unless it "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2); see also 28 U.S.C. § 2254(e)(1) ("In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a

---

[7] State v. Brown, No. 2019 KW 0237, 2019 WL 1779459 (La. App. 1st Cir. Apr. 23, 2019); State Rec., Vol. 3 of 4.
[8] State v. Brown, No. 2019 KW 0829, 2019 WL 4748035 (La. App. 1st Cir. Sept. 30, 2019); State Rec., Vol. 4 of 4.
[9] State v. Brown, 301 So. 3d 1153 (La. 2020); State Rec., Vol. 4 of 4.
[10] Rec. Doc. 1.
[11] Rec. Doc. 11.
[12] Rec. Doc. 12.

determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.").

As to pure questions of law and mixed questions of law and fact, a federal court must defer to the state court's decision on the merits of such a claim unless that decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). Courts have held that the "'contrary to' and 'unreasonable application' clauses [of § 2254(d)(1)] have independent meaning." Bell, 535 U.S. at 694.

Regarding the "contrary to" clause, the United States Fifth Circuit Court of Appeals has explained:

> A state court decision is contrary to clearly established precedent if the state court applies a rule that contradicts the governing law set forth in the [United States] Supreme Court's cases. A state-court decision will also be contrary to clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of the [United States] Supreme Court and nevertheless arrives at a result different from [United States] Supreme Court precedent.

Wooten v. Thaler, 598 F.3d 215, 218 (5th Cir. 2010) (footnotes, internal quotation marks, ellipses, and brackets omitted).

Regarding the "unreasonable application" clause, the United States Supreme Court has held: "[A] state-court decision is an unreasonable application of our clearly established precedent if it correctly identifies the governing legal rule but applies that rule unreasonably to the facts of a particular prisoner's case." White v. Woodall, 572 U.S. 415, 426 (2014). However, a federal habeas court must be mindful that "an unreasonable application is different from an incorrect one."

Bell, 535 U.S. at 694; accord Harrington v. Richter, 562 U.S. 86, 102-03 (2011) ("Section 2254(d) reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." (quotation marks omitted)); Langley, 926 F.3d at 156 ("The Supreme Court has repeatedly held that it is not enough to show the state court was wrong."); Puckett v. Epps, 641 F.3d 657, 663 (5th Cir. 2011) ("Importantly, 'unreasonable' is not the same as 'erroneous' or 'incorrect'; an incorrect application of the law by a state court will nonetheless be affirmed if it is not simultaneously unreasonable."). Therefore:

> "[T]he [AEDPA's] relitigation bar forecloses relief unless the prisoner can show the state court was *so* wrong that the error was well understood and comprehended in existing law beyond any possibility for fairminded disagreement. In other words, the unreasonable-application exception asks whether it is beyond the realm of possibility that a fairminded jurist could agree with the state court.

Langley, 926 F.3d at 156 (citations and quotation marks omitted). "Under AEDPA's relitigation bar, the very existence of reasonable disagreement forecloses relief." Id. at 170.

Further, the Supreme Court has expressly cautioned:

> Section 2254(d)(1) provides a remedy for instances in which a state court unreasonably applies this Court's precedent; it does not require state courts to extend that precedent or license federal courts to treat the failure to do so as error. Thus, if a habeas court must extend a rationale before it can apply to the facts at hand, then by definition the rationale was not clearly established at the time of the state-court decision. AEDPA's carefully constructed framework would be undermined if habeas courts introduced rules not clearly established under the guise of extensions to existing law.

Woodall, 572 U.S. at 426 (citations and quotation marks omitted). Therefore, when the Supreme Court's "cases give no clear answer to the question presented, let alone one in [the petitioner's] favor, it cannot be said that the state court unreasonably applied clearly established Federal law." Wright v. Van Patten, 552 U.S. 120, 126 (2008) (quotation marks and brackets omitted).

In summary, "AEDPA prevents defendants – **and federal courts** – from using federal habeas corpus review as a vehicle to second-guess the reasonable decisions of state courts." Renico v. Lett, 559 U.S. 766, 779 (2010) (emphasis added).  The Supreme Court has expressly warned that although "some federal judges find [28 U.S.C. § 2254(d)] too confining," it is nevertheless clear that "all federal judges must obey" the law and apply the strictly deferential standards of review mandated therein.  Woodall, 572 U.S. at 417.

## II.  Facts

On direct appeal, the Louisiana First Circuit Court of Appeal summarized the facts in this case as follows:

> On September 27, 1980, near Houma, Louisiana, two fishermen spotted the naked body of a female in Sweetwater Pond, near Bayou Sale Road in Terrebonne Parish.  Upon recovering the body, the police discovered that the female's hands had been tied behind her back, that a white handkerchief or scarf had been tied around her neck, and that a nylon cord connected to a cinder block had also been tied around her neck.  The victim was subsequently identified as Edith West.  An autopsy revealed that the victim had likely died from asphyxia.
>
> In investigating the victim's death, the police initially developed four suspects:  James Hines, Randy Bucaloo, Mike Burnett, and the defendant.  These four men lived together in a trailer on Edward Street in Houma.  Following interviews with Hines and Burnett, the police narrowed their suspect list to Burnett and the defendant.  However, due to a lack of evidence, no arrests were made.
>
> No further substantial progress was made in the case until approximately 2000.  At that time, Captain Darryl Stewart of the Terrebonne Parish Sheriff's Office (TPSO) was informed that a Detective Wolfe had received two statements from out-of-state individuals who wished to give information regarding Edith West's death.  However, it is unclear exactly what information these individuals provided and whether any action was taken as a result of this information.
>
> In June 2001, Captain Stewart was contacted by telephone and advised that a person in New Iberia, Mike Brown,[FN1] wished to give information pertaining to Edith West's murder.  Mike Brown had been arrested on narcotics-related charges and apparently believed that he could reduce his possible prison sentence by trading information with the police.  In two interviews, Mike Brown gave Captain Stewart information that implicated both the defendant and Burnett in the victim's murder.  He also told Captain Stewart about Vickie Brown, defendant's ex-girlfriend/ex-wife,[FN 2] who also might have further information.  However,

Captain Stewart was unable to locate Vickie Brown, Burnett, or the defendant, so he was unable to make an arrest at that time.

> [FN1]  Mike Brown is of no relation to the defendant.

> [FN2]  Vickie Brown is of no relation to Mike Brown.  The record reflects that she dated the defendant beginning in 1980 and married him in Oklahoma sometime thereafter.  However, she was still legally married to someone else at the time she married the defendant.  Vickie Brown and the defendant separated around 1983, but they never formally divorced, because Vickie Brown regarded their marriage as illegal.  She has since remarried another man with the surname of Brown.

In 2010, TPSO Detective Kody Voisin received a call from someone with information about an old homicide case.  After comparing the information from the phone call with facts from old case files, Detective Voisin began to focus on the murder of Edith West.  Throughout the course of his subsequent investigation, Detective Voisin was able to speak with James Hines, Mike Brown, and Vickie Brown.  Vickie Brown provided Detective Voisin with details that were consistent with those provided by Mike Brown.  Based upon that evidence, Detective Voisin secured an arrest warrant for the defendant.  Defendant was located in Alabama and subsequently transported to Louisiana, where he was indicted with the second degree murder of Edith West.[FN3]

> [FN3]  The record appears to indicate that Burnett might have died before he could be arrested in connection with this offense.

….
At trial, James Hines provided some background information of the events immediately preceding Edith West's murder.  Hines knew the victim's estranged husband, Archie West, from his hometown of Cullman, Alabama, and he had stayed with Archie in Westwego for a short time after moving to Louisiana.  At some point in September 1980, Archie was arrested and sent back to prison in Alabama.  Hines testified that after Archie's arrest, Burnett went to the Westwego apartment to retrieve Archie's automobile and other belongings.  Burnett brought everything back to the Edward Street trailer in Houma.  In late September, Edith West showed up at the trailer, wanting to retrieve some objects from Archie's car.  Hines testified that Burnett would not allow the victim to access the car until he spoke to Archie.  Edith West spent the night at the trailer, and Hines testified that she was still there when he and Randy Bucaloo left for work around 6:00 a.m. the next morning.  However, when they arrived home at 5:30 p.m., she was not present at the trailer.  Hines never saw the victim again.  He testified that Burnett later told him, "We killed her."  Hines understood "we" to mean Burnett and the defendant.

At trial, Mike Brown and Vickie Brown testified regarding the confessions that defendant made to each of them.  Mike Brown testified that he knew defendant from working with him at a motorcycle shop in Houma around the time of the

murder. He remained friendly with the defendant throughout the 1980s and 1990s. On a trip he took through Cullman, Alabama, sometime in the 1990s, Mike Brown stopped to visit the defendant, who was living there at the time.

During their visit together, defendant revealed to Mike Brown that he had been having nightmares and that he was having trouble dealing with "what had happened." Defendant told Mike Brown that he and Burnett had taken the victim down to "the canal," intending to scare her. Defendant stated that he threw the victim into the canal, but that he panicked when she did not surface, so he jumped in and pulled her back onto the bank. Defendant told Mike Brown that Burnett stated that they were not "having this," and that they had come to "finish this." At that point, defendant stopped talking about the incident.

Mike Brown testified that when he contacted Captain Stewart in 2001, he was facing significant jail time on a charge of possession of marijuana with intent to distribute. However, he was not offered a plea deal or any other consideration as a result of the information he provided to Captain Stewart. He eventually pled guilty and was sentenced to fifteen years of imprisonment, with ten of those years suspended, so he had already completed his incarceration at the time of defendant's trial.

Vickie Brown testified at trial and detailed her relationship with the defendant. She recalled meeting defendant for the first time about a week after Edith West's murder.[FN4] She testified that defendant told her about the incident several times throughout their relationship. According to Vickie Brown, defendant stated that he believed Edith West had snitched on his friend "Possum,"[FN5] causing him to be sent to jail in Alabama. When the victim came to Houma, defendant and Burnett lured her to a trailer, where they beat her, stripped her naked, bound her hands behind her back, and threw her into the trunk of a car. Defendant told Vickie Brown that the victim made noise while she was in the trunk of the car and that she continually moved her hands to the front of her body, despite having her hands tied behind her. When they got to the "bayou," defendant got the victim out of the trunk and threw her into the water with a cement block tied behind her. Defendant told Vickie Brown that every time they would get the victim into the water, she would manage to somehow stand up with her arms in front of her. Defendant said that he eventually decided he could not kill Edith West, so he grabbed hold of her and pulled her onto the bank. Defendant said at this point, Burnett dragged the victim back into the bayou and held her head under water until she died.

> [FN4] Vickie Brown testified that she met the defendant about a week after her September 29, 1980 birthday.

> [FN 5] "Possum" was a nickname the defendant and his friends used for Archie West.[13]

---

[13] State v. Brown, No. 2013 KA 0560, 2014 WL 2711808, at *1-3 (La. App. 1st Cir. Apr. 30, 2014); State Rec., Vol. 1 of 4.

### III.  Petitioner's Claims

### A.  Ineffective Assistance of Counsel

Petitioner's first claim is that his counsel was ineffective in that she refused to allow him

to testify at trial on his own behalf.  Specifically, he alleges:

> Denial of effective assistance of counsel in violation of Due Process and
> Petitioner's 6th amendment constitutional right – when trial counsel refused to
> allow Mr. Brown to stand before the 12 jurors and testify soly [sic] because she felt
> his testimony would be perjury.  Mr. Brown proved this constitutional violation
> during his post-conviction evidentiary hearing – when his trial counsel admitted her
> refusal and the reasons.[14]

However, that is simply untrue – at that evidentiary hearing, counsel did **not** "admit" that

she "refused" to allow petitioner testify; on the contrary she said the opposite.

At that hearing, which was held by the state district court on January 23, 2019, petitioner's

trial counsel, Kathryn Seal Lirette, testified after petitioner waived the attorney/client privilege on

the record.[15]  Lirette first testified that petitioner admitted to her that he was in fact involved in the

instant crime:

Q.      The question is the story he gave – remember the story he gave you –

A.      I do.

Q.      – about the incident?

A.      I do.

Q.      Can you tell me what that was?

A.      Well, he told me that he was part of a biker gang.  He kind of said he really
wasn't a member per se yet, but he hung out with them all the time and they were
some bad dudes; and there was one man who got arrested because his wife ratted
him out I believe is what he said, and so there was word came down that they were

---

[14] Rec. Doc. 1-1, p. 8.
[15] State Rec., Vol. 2 of 4, transcript of January 23, 2019, p. 7.

supposed to kill this woman. So there was another guy and Mr. Brown who actually took the woman, went down to the bayou somewhere – and I don't remember, it might have been Bayou Sale – and tried to drown this woman. Mr. Brown was there, Mr. Brown participated. Then Mr. Brown got I guess some – remorse or whatever, and he said he tried to save her at that point in time. But he was – he did say he was there, he participated, and he knew it wasn't a good thing. But he said he was afraid of all of these other bikers because they were big and bad and they killed people.

Q.    But he also told you that at one point he tried to withdraw from that incident.

A.    He said he tried to stop the other guy from killing her, yes, he did, after he had already dunked her a couple of times and she came back up.[16]

Lirette then addressed the advice she gave to petitioner as to whether he should testify at trial:

Q.    Okay. So then all the trial is gone through and everything is up to the Defense now, and the State's rested. Did you talk to the defendant about his taking the stand?

A.    Yes.

Q.    And what was his opinion?

A.    He asked me what I thought.

Q.    Uh-huh (indicating yes). And your answer to him was?

A.    And I told him that knowing what you've told me and knowing how well the district attorney questions you, I don't think it would be in your best interest to testify. You can, but I wouldn't do it.[17]

She later emphatically reiterated that she did **not** prohibit petitioner from taking the stand, stating:

"I never make that decision. It's not my decision to make."[18] She also made clear that it was

petitioner who made the ultimate decision on the matter:

Q.    And is it your testimony today that it was his decision that he would not testify?

---

[16] Id. at pp. 8-9.
[17] Id. at pp. 18-19.
[18] Id. at p. 21.

A.    Yes.[19]

When petitioner then took the stand at the post-conviction hearing, his version of events repeatedly changed during the course of his testimony.  At times, he indicated that Lirette would not allow him to testify.[20]  However, on cross-examination, he ultimately conceded that he in fact made the decision not to testify:

> Q.    And isn't it true that you took Mrs. Lirette's advice and agreed not to testify?
>
> A.    Well, I didn't testify because she told me not to, so there you are.
>
> Q.    But it was your decision, based upon her advice.
>
> A.    I suppose it was.[21]

At the conclusion of the hearing, the state district court then found as follows:

> When it comes to the issue of refusal to allow a defendant to testify, the Court finds that that has not been proven.  Counsel Kathryn Lirette denies this position.  Her position is that that was always the decision to be made by the defendant.  It was not her recommendation.  The Court finds that that's what took place in connection with this case.  She did not refuse to allow him to testify.[22]

When petitioner then sought supervisory review of that determination, the Louisiana First Circuit Court of Appeal denied relief without assigning reasons,[23] and the Louisiana Supreme Court simply stated:  "Denied.  Applicant fails to show that he received ineffective assistance of counsel under the standard of Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)."[24]

---

[19] Id. at p. 27.

[20] See, e.g., id. at pp. 37 and 40.

[21] Id. at p. 43.

[22] Id. at p. 58.

[23] State v. Brown, No. 2019 KW 0237, 2019 WL 1779459 (La. App. 1st Cir. Apr. 23, 2019); State Rec., Vol. 3 of 4.

[24] State v. Brown, 301 So. 3d 1153 (La. 2020); State Rec., Vol. 4 of 4.

As the Louisiana Supreme Court correctly indicated, <u>Strickland</u> is the clearly established federal law governing such claims of ineffective assistance of counsel. In <u>Strickland</u>, the United States Supreme Court held:

> A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction … has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction … resulted from a breakdown in the adversary process that renders the result unreliable.

<u>Id.</u> at 697.

When assessing whether counsel's performance was deficient, a federal court must always be mindful that "<u>Strickland</u> does not guarantee perfect representation, only a reasonably competent attorney." <u>Harrington v. Richter</u>, 562 U.S. 86, 110 (2011). Therefore, "[t]o establish deficient performance, a person challenging a conviction must show that counsel's representation fell below an objective standard of reasonableness." <u>Id.</u> at 104 (quotation marks omitted). Moreover, the Supreme Court has cautioned:

> Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy. There are countless ways to provide effective assistance in any given case.

> Even the best criminal defense attorneys would not defend a particular client in the same way.

Strickland, 466 U.S. at 689 (citations and quotation marks omitted).

Strickland's prejudice component is no less exacting.  The Supreme Court has explained:

> In assessing prejudice under Strickland, the question is not whether a court can be certain counsel's performance had no effect on the outcome or whether it is possible a reasonable doubt might have been established if counsel acted differently.  Instead, Strickland asks whether it is reasonably likely the result would have been different.  This does not require a showing that counsel's actions more likely than not altered the outcome, but the difference between Strickland's prejudice standard and a more-probable-than-not standard is slight and matters only in the rarest case.  The likelihood of a different result must be substantial, not just conceivable.

Richter, 562 U.S. at 111-12 (citations and quotation marks omitted).

Where, as here, a habeas petitioner's ineffective assistance of counsel claim has been denied on the merits in the state courts, he faces even greater obstacles to obtaining relief on the claim in federal court.  Because such claims present mixed questions of law and fact, the petitioner is entitled to federal habeas relief only if he shows that the state court decision denying his claim was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1); Moore v. Cockrell, 313 F.3d 880, 881 (5th Cir. 2002).

Under that deferential standard of review, the determinative factor is not simply whether counsel was ineffective in the independent view of the federal court; rather, it is "whether the state court's application of the Strickland standard was unreasonable."  Richter, 562 U.S. at 101.  Therefore, "[w]hen § 2254(d) applies, the question is not whether counsel's actions were reasonable.  **The question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard**."  Id. at 105 (emphasis added).  That makes a petitioner's

already difficult task even more so, because it requires the federal court to accord the state court decision "a deference and latitude that are not in operation when the case involves review under the <u>Strickland</u> standard itself." <u>Id.</u> at 101; <u>see also</u> <u>id.</u> at 105 ("The standards created by <u>Strickland</u> and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so."). As a result, in effect, the federal court must "afford **both** the state court **and** the defense attorney the benefit of the doubt." <u>Woods v. Etherton</u>, 136 S. Ct. 1149, 1151 (2016) (emphasis added; quotation marks omitted).

For the following reasons, the Court finds that, under that doubly deferential standard of review, it cannot be said that relief is warranted with respect to petitioner's ineffective assistance of counsel claim.

Regarding claims such as the one petitioner asserts, the law is clear: "[I]t cannot be doubted that a defendant in a criminal case has the right to take the witness stand and to testify in his or her own defense." <u>Rock v. Arkansas</u>, 483 U.S. 44, 49 (1987). That said, as the state district judge correctly noted, petitioner simply has not met his burden to prove that he was in fact prohibited from testifying by his trial counsel.

In a case in which a petitioner made a similar claim, the United States Seventh Circuit Court of Appeals observed:

> There is grave practical difficulty in establishing a mechanism that will protect a criminal defendant's personal right (that is, a right not waivable by counsel) to testify on his own behalf without rendering the criminal process unworkable. It is extremely common for criminal defendants not to testify, and there are good reasons for this, as we have seen. Yet it is simple enough after being convicted for the defendant to say, "My lawyer wouldn't let me testify. Therefore I'm entitled to a new trial." ...
> ... [A] barebones assertion by a defendant, albeit made under oath, is insufficient to require a hearing or other action on his claim that his right to testify in his own defense was denied him. It just is too facile a tactic to be allowed to

succeed.    Some greater particularity is necessary – and also we think some
substantiation is necessary, such as an affidavit from the lawyer who allegedly
forbade his client to testify – to give the claim sufficient credibility to warrant a
further investment of judicial resources in determining the truth of the claim.

Underwood v. Clark, 939 F.2d 473, 475-76 (7th Cir. 1991); accord Beasley v. Vannoy, Civ. Action

No. 19-9925, 2020 WL 974930, at *17 (E.D. La. Jan. 24, 2020), adopted, 2020 WL 972749 (E.D.

La. Feb. 28, 2020); Watson v. Vannoy, Civ. Action No. 18-10085, 2019 WL 2619917, at *12 (E.D.

La. May 21, 2019), adopted, 2019 WL 2617231 (E.D. La. June 26, 2019), certificate of

appealability denied, No. 19-30541, 2020 WL 8615600 (5th Cir. Oct. 9, 2020), cert. denied, 141

S. Ct. 1428 (2021); Baker v. Cain, Civ. Action No. 06-2039, 2007 WL 2174959, at *10-11 (E.D.

La. July 26, 2007); White v. Cain, Civ. Action No. 06-1576, 2006 WL 3703240, at *4-5 (E.D. La.

Dec. 11, 2006).

Here, no such substantiation has been provided.    On the contrary, during the post-

conviction hearing, Lirette expressly testified under oath that **she did not prohibit petitioner**

**from testifying**.  She further testified that she recommended that he not take the stand at trial, but

she left the ultimate decision to him.    Moreover, although petitioner's own testimony on the issue

was equivocal and conflicting, he admitted on cross-examination that he had in fact made the

decision himself.    Therefore, the state court's underlying factual finding that no prohibition

occurred has neither been adequately rebutted nor shown to be unreasonable.    Accordingly, this

claim necessarily fails.

Further, to the extent that petitioner is contending that his counsel was ineffective for

recommending that he not take the stand, that contention likewise has no merit.  A decision whether

to put a criminal defendant on the stand "is a 'judgment call' which should not easily be

condemned with the benefit of hindsight."  United States v. Garcia, 762 F.2d 1222, 1226 (5th Cir.

14

1985); accord United States v. Mullins, 315 F.3d 449, 453 (5th Cir. 2002); Amos v. Cain, Civ. Action No. 04-2029, 2008 WL 782472, at *11 (E.D. La. Mar. 20, 2008); Curtis v. Cain, Civ. Action No. 06-1676, 2008 WL 482849, at *10 (E.D. La. Feb. 13, 2008).  Such a matter is inherently one of trial strategy, and federal habeas courts generally are not to second-guess counsel's decisions on matters of trial tactics; rather, again, courts are to employ a strong presumption that counsel's conduct falls within a wide range of reasonable assistance and, under the circumstances, might be considered sound trial strategy.  Strickland, 466 U.S. at 689.

The instant habeas proceeding is far removed from the context of the actual trial, and this Court has no mechanism available to fairly judge Lirette's assessment of her own client at the time and her view of the strength of the prosecution's case as it was presented live.  Moreover, petitioner had already admitted to her that he participated in the crime, and so her fear that he might falter under a prosecutor's skillful cross-examination was hardly unwarranted.  On the contrary, it was somewhat prescient, given his adverse concessions on cross-examination at the post-conviction evidentiary hearing.  Under these circumstances and in light of the deference that must be accorded to counsel's strategic decisions, the Court declines to second-guess Lirette's decision to advise petitioner against taking the stand at trial.

In summary, to be entitled to relief, petitioner must demonstrate that the state court decision rejecting his ineffective assistance of counsel claim was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States.  He has not made that showing in the instant case.  Accordingly, utilizing the AEDPA's doubly deferential standards of review applicable to such claims, this Court should likewise deny relief.

## **B.  Insufficient Evidence**

Petitioner's second claim is that there was insufficient evidence to support his conviction.

In rejecting that claim on direct appeal, the Louisiana First Circuit Court of Appeal began by

noting:

> [D]efendant alleges that the evidence presented at trial was insufficient to support his conviction for second degree murder.  Specifically, he argues that the state's case lacked physical evidence and that his guilt was only supported by the testimonies of incredible witnesses who were not actual eyewitnesses to any crime.
>
> A conviction based on insufficient evidence cannot stand, as it violates due process.  See U.S. Const. amend. XIV; LSA-Const. art. I, § 2.  In reviewing claims challenging the sufficiency of the evidence, this court must consider whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.  See Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979).  See also LSA-C.Cr.P. art. 821(B); State v. Ordodi, 06-0207 (La. 11/29/06), 946 So.2d 654, 660; State v. Mussall, 523 So.2d 1305, 1308-09 (La. 1988).  The Jackson standard of review, incorporated in Article 821(B), is an objective standard for testing the overall evidence, both direct and circumstantial, for reasonable doubt.  When analyzing circumstantial evidence, LSA-R.S. 15:438 provides that the fact finder must be satisfied the overall evidence excludes every reasonable hypothesis of innocence.  State v. Patorno, 01-2585 (La.App. 1st Cir. 6/21/02), 822 So.2d 141, 144.
>
> When the key issue is the defendant's identity as the perpetrator, rather than whether the crime was committed, the state is required to negate any reasonable probability of misidentification.  Positive identification by only one witness is sufficient to support a conviction.  It is the fact finder who weighs the respective credibility of each witness, and this court will generally not second-guess those determinations.  State v. Hughes, 05-0992 (La. 11/29/06), 943 So.2d 1047, 1051; State v. Davis, 01-3033 (La.App. 1st Cir. 6/21/02), 822 So.2d 161, 163-64.
>
> In the instant case, defendant does not challenge the fact that Edith West was the victim of a second degree murder.  Therefore, we need only determine whether the state presented evidence sufficient to implicate the defendant as a principal to that murder.  All persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime, are principals.  LSA-R.S. 14:24.[25]

---

[25] State v. Brown, No. 2013 KA 0560, 2014 WL 2711808, at *2 (La. App. 1st Cir. Apr. 30, 2014); State Rec., Vol. 1 of 4.

The Court of Appeal thereafter proceeded to recount the testimony adduced at trial, their summary

of which is quoted *supra*, and then ultimately rejected petitioner's claim, stating:

> On appeal, defendant contends that the evidence introduced by the state at trial was insufficient, because nothing physically linked him to the murder of Edith West and because the witnesses detailing his confessions were not credible.
>
> The term "confession" is applied only to an admission of guilt, not to an acknowledgment of facts merely tending to establish guilt. LSA-R.S. 15:449. Confessions are considered to be direct evidence. See State v. Marr, 626 So.2d 40, 45 (La.App. 1st Cir. 1993), writ denied, 93-2806 (La. 1/7/94), 631 So.2d 455. In the instant case, defendant's statements to Mike Brown and Vickie Brown were clearly confessions to his participation as a principal in the second degree murder of Edith West. Although defendant's versions of the incident would indicate he did not complete the act himself, he participated in its planning and execution, and he aided and abetted any act by Burnett that ultimately resulted in the victim's death. Clearly, defendant's statements to Mike Brown and Vickie Brown were both acknowledgments of guilt from which no inferences need be drawn. Thus, they are direct evidence of his guilt. See Marr, 626 So.2d at 46. Viewing the evidence in the light most favorable to the prosecution and despite a lack of physical evidence, we conclude that the state clearly presented sufficient evidence, through his confessions, for the jury to convict defendant of the second degree murder of Edith West.
>
> Defendant also argues that Mike Brown and Vickie Brown were not credible witnesses. He claims that at the time Mike Brown gave his initial statement to Captain Stewart in 2001, he was facing a lengthy prison sentence and, therefore, had motivation to lie. However, Mike Brown testified that he received no consideration, in sentencing or otherwise, for the information that he provided in 2001. Further, the jury was clearly presented with the facts surrounding Mike Brown's criminal history. Defendant also claims that Vickie Brown had motivation to lie in her testimony because of the fact that defendant had ended their relationship. However, Vickie Brown did not testify specifically to the reasons for her split from defendant. She merely testified that she and defendant separated and that she eventually began to date someone else while she was still "married" to him.
>
> The trier of fact is free to accept or reject, in whole or in part, the testimony of any witness. The trier of fact's determination of the weight to be given evidence is not subject to appellate review. An appellate court will not reweigh evidence to overturn a fact finder's determination of guilt. State v. Taylor, 97-2261 (La.App. 1st Cir. 9/25/98), 721 So.2d 929, 932. Here, the jury clearly gave weight to either or both of the testimonies of Mike Brown and Vickie Brown. We are constitutionally precluded from acting as a "thirteenth juror" in assessing what weight to give evidence in criminal cases. See State v. Mitchell, 99-3342 (La. 10/17/00), 772 So.2d 78, 83. After a thorough review of the record, we cannot say

that the jury's determination of defendant's guilt was irrational under the facts and circumstances presented to them.  See Ordodi, 946 So.2d at 662.
            These assignments of error are without merit.[26]

The Louisiana Supreme Court then denied petitioner's related writ application without assigning additional reasons.[27]

Because a sufficiency of the evidence claim presents a mixed question of law and fact, this Court must defer to the state court's decision rejecting this claim unless petitioner shows that the decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1); Davila v. Davis, 650 F. App'x 860, 866 (5th Cir. 2016), aff'd, 137 S. Ct. 2058 (2017).  For the following reasons, it is clear that he has not done so.

As the Louisiana First Circuit Court of Appeal correctly noted, claims of insufficient evidence are to be analyzed pursuant to the standard set forth in Jackson v. Virginia, 443 U.S. 307 (1979).  In Jackson, the United States Supreme Court held that, in assessing such a claim, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  Id. at 319.  Moreover, it is important to remember that "the Jackson inquiry does not focus on whether the trier of fact made the correct guilt or innocence determination …."  Herrera v. Collins, 506 U.S. 390, 402 (1993).  On the contrary, Jackson requires only that a jury's guilty verdict be a "rational" one.  Id.

---

[26] Id. at *3-4.
[27] State ex rel. Brown v. State, 177 So. 3d 1066 (La. 2015); State Rec., Vol. 1 of 4.

Here, the state courts determined that the jury's verdict was rational, and the question before this Court on habeas review is limited to **only** whether the state court's determination that the jury's verdict was rational was an unreasonable one.  As the United States Supreme Court has explained:

> The opinion of the Court in <u>Jackson v. Virginia</u>, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), makes clear that it is the responsibility of the jury – not the court – to decide what conclusions should be drawn from evidence admitted at trial.  A reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury.  What is more, a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court.  The federal court instead may do so only if the state court decision was "objectively unreasonable." <u>Renico v. Lett</u>, 559 U.S. ——, ——, 130 S.Ct. 1855, 1862, 176 L.Ed.2d 678 (2010) (internal quotation marks omitted).
>
> Because rational people can sometimes disagree, the inevitable consequence of this settled law is that judges will sometimes encounter convictions that they believe to be mistaken, but that they must nonetheless uphold.

<u>Cavazos v. Smith</u>, 565 U.S. 1, 2 (2011); <u>accord</u> <u>Langley v. Prince</u>, 926 F.3d 145, 155 (5th Cir. 2019) ("The Supreme Court has repeatedly held that it is not enough to show the state court was wrong.").

For the following reasons, it simply was not unreasonable for the state courts to find that the jury's verdict convicting petitioner of second degree murder was a rational one.

Under Louisiana law, "[s]econd degree murder is the killing of a human being … [w]hen the offender has a specific intent to kill or to inflict great bodily harm …."  La. Rev. Stat. Ann. § 14:30.1(A)(1).  Moreover:

> In order to prove second degree murder under [that definition], the State must prove the killing and that the defendant had specific intent to kill or inflict great bodily harm.  Specific criminal intent is defined as that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act.  The determination of specific criminal intent is a question of fact.  Specific intent may

> be inferred from the circumstances and from the defendant's actions, and the intent to kill or to inflict great bodily harm may be inferred from the extent and severity of the victim's injuries.

State v. Durand, 963 So. 2d 1028, 1034 (La. App. 5th Cir. 2007) (footnotes and quotation marks omitted). Louisiana law further provides: "All persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime, are principals." La. Rev. Stat. Ann. § 14:24. Under that law, "all persons involved in the commission of a crime are equally culpable." State v. Clark, 306 So. 3d 619, 631 (La. App. 5th Cir. 2020), writ denied, 310 So. 3d 1150 (2021). In other words, by "[a]cting in concert, each man [becomes] responsible not only for his own acts but for the acts of the other." State v. Anderson, 707 So.2d 1223, 1224 (La. 1998).

At trial, Vickie Brown testified that petitioner told her that he and Mike Burnett bound the victim's hands and tied a cement block behind her and then threw her into the bayou. Mike Brown also testified at trial, saying that he, too, was told by petitioner that he and Burnett had thrown the victim in the water. And, in fact, the victim was then found dead in a bayou with her hands tied behind her back and a cement block tied around her neck. Based on that evidence, it simply cannot be legitimately said that the jury had insufficient evidence to conclude that the victim died after petitioner and Burnett, while acting in concert, bound her and threw her into the bayou with the specific intent to kill her or to inflict great bodily harm on her.

Petitioner's only argument to contrary is that the witnesses against him were not credible. But that argument is a nonstarter because credibility determinations are the province of the jurors, and a federal habeas court generally will not grant relief on a sufficiency claim grounded on such

issues of credibility.  See Schlup v. Delo, 513 U.S. 298, 330 (1995) ("[U]nder Jackson, the assessment of the credibility of witnesses is generally beyond the scope of review."); Ramirez v. Dretke, 398 F.3d 691, 695 (5th Cir. 2005) ("All credibility choices and conflicting inferences are to be resolved in favor of the verdict."); McCowin v. Scott, No. 93-5340, 1994 WL 242581, at *2 (5th Cir. May 26, 1994); Phillips v. Cain, Civ. Action No. 11-2725, 2012 WL 2564926, at *14 (E.D. La. Apr. 11, 2012), adopted, 2012 WL 2565025 (E.D. La. July 2, 2012); Picou v. Cain, Civ. Action No. 06-6258, 2007 WL 1521021, at *5 (E.D. La. May 22, 2007).

In summary, when the evidence in this case is viewed in the light most favorable to the prosecution, it simply cannot be said that the jury's guilty verdict was irrational.  Therefore, petitioner cannot show that the state court's decision rejecting his claim was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States.  Accordingly, under the doubly deferential standards of review which must be applied by this federal habeas court, relief is not warranted.

## C.  Actual Innocence

Petitioner's third and final claim is that he should be granted relief because he is actually innocent.  That claim fails for a simple, straightforward reason:  "The Fifth Circuit does not recognize freestanding claims of actual innocence on federal habeas review."  In re Swearingen, 556 F.3d 344, 348 (5th Cir. 2009); accord Brown v. Vannoy, 800 F. App'x 277, 278 (5th Cir.) ("[A] freestanding claim of actual innocence does not state an independently cognizable ground for § 2254 relief."), cert. denied, 141 S. Ct. 328 (2020).

## **RECOMMENDATION**

It is therefore **RECOMMENDED** that the federal application for habeas corpus relief filed by Ricky D. Brown be **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  28 U.S.C. § 636(b)(1); Douglass v. United Services Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc).

New Orleans, Louisiana, this __18th__ day of January, 2022.


_____
**DANA M. DOUGLAS**
**UNITED STATES MAGISTRATE JUDGE**